Polly Ann POWELL, Wife, Thomas C. Powell, Husband, Plaintiffs-Appellants,

v.

TUCSON AIR MUSEUM FOUNDATION OF PIMA COUNTY, a non-profit Arizona corporation, Defendant-Appellee.

No. 84–2137.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 13, 1985.

Decided Sept. 18, 1985.

---

William C. Mach, Tucson, Ariz., for plaintiffs-appellants.

Max C. Richards, Jackson G. Gallup, Max C. Richards, P.C., Tucson, Ariz., for defendant-appellee.

Before POOLE and NELSON, Circuit Judges, and McGOVERN,* District Judge.

POOLE, Circuit Judge:

Polly Ann Powell ("Powell") and her husband appeal from the district court's grant of summary judgment in their action seeking back pay allegedly due her under the Fair Labor Standards Act ("FLSA"). The district court found that Powell's former employer, the Tucson Air Museum ("Museum") was not subject to the minimum-wage and overtime requirements of the Act. We affirm.

Powell was employed by the Museum as an after-hours security guard from January 15, 1979, to February 2, 1983. Powell moved her personal mobile home onto the grounds of the Museum so that she could provide after-hours security services on a regular basis. Powell's "duty day" consist-

---

* The Honorable Walter T. McGovern, Chief Judge, United States District Court for the Western District of Washington, sitting by designation.

ed of three two-hour patrols of the Museum grounds between sundown and sunrise; she was on duty every other day.

Powell resigned her position on February 2, 1983, after disputes arose between her and the Museum. She filed suit in state court in August 1983 on behalf of her marital community to recover unpaid minimum wages and overtime claimed to be mandated by the FLSA. The Museum removed the action to United States District Court.

The Museum moved for summary judgment on the ground that the Museum was not subject to coverage under the Act because the Museum was not "an enterprise engaged in commerce or in the production of goods for commerce," as defined by 29 U.S.C. §§ 203(s)(1) and (6). Powell argued in opposition to the motion for summary judgment that the Museum was subject to coverage under section 203(s)(6) of the Act because it was a "public agency" or because it performs activities of a public agency. The district court granted summary judgment in favor of the Museum. Powell timely appealed.

■ We review a district court's grant of summary judgment de novo. *See, e.g., Castelli v. Douglas Aircraft Co.*, 752 F.2d 1480, 1482 (9th Cir.1985). We will affirm if we find that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Arizona Laborers, Teamsters and Cement Masons Local 395 Health and Welfare Trust Fund v. Conquer Cartage Co.*, 753 F.2d 1512, 1515 (9th Cir.1985); Fed.R.Civ.P. 56(c). Questions of statutory interpretation are also reviewed de novo. *See, e.g., Callejas v. McMahon*, 750 F.2d 729, 730 (9th Cir.1985).

Powell argues on appeal that the Museum, because of its contractual relationship with Pima County, is performing an "activity of a public agency," and is thus subject to the FLSA pursuant to 29 U.S.C. § 203(s)(6). The Museum is a non-profit corporation that entered into an exclusive management agreement with Pima County, Arizona, to lease certain real property from the County for the purposes of developing, operating, and improving a public recreational facility dedicated to the display of historic aircraft. The agreement provides the County with the power to approve admission fees, concessionaires, hours of operation, and improvements to the property. It specifies the accounting methods to be used by the Museum, and requires the Museum to submit an annual budget and to open its books for inspection and audit. It prohibits the Museum from discriminating in employment on the basis of race, sex, religion, political affiliation, age or physical handicap; it requires the Museum to take steps to maintain and improve the natural resources and scenic values of the land.

■ We reject Powell's argument that the contractual relationship between the Museum and Pima County is so close as to render the Museum a de facto public agency or an activity of a public agency so as to subject it to the requirements of the Act.

■ When interpreting statutes, the plain meaning of the words used is controlling, "absent a clearly expressed legislative intention to the contrary." *City of Edmonds v. United States Department of Labor*, 749 F.2d 1419, 1421 (9th Cir.1984) (quoting *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)). The FLSA provides that "[e]very employer shall pay to each of his employees who in any workweek * * * is employed in an enterprise engaged in commerce" a specified minimum wage. 29 U.S.C. § 206(a). Section 203(s) provides, in pertinent part, that "enterprise engaged in commerce" means "an enterprise which has employees engaged in commerce * * * and which— * * * is an activity of a public agency." 29 U.S.C. § 203(s). "Public agency" is defined to include "the government of a State or political subdivision thereof" and "any agency of * * * a State, or a political subdivision of a State." 29 U.S.C. § 203(x).

■ The key factors in determining whether a private party should be con-

sidered a public agency are whether the entity is directly responsible to public officials or to the general public, *Skills Development Services, Inc. v. Donovan,* 728 F.2d 294, 300 (6th Cir.1984); *Williams v. Eastside Mental Health Center, Inc.,* 669 F.2d 671, 679 (11th Cir.1982), and whether the parties' contracts designated them as independent contractors, not state agencies, *Skills Development,* 728 F.2d at 299.[1] The ability of a state agency to hire and fire the employees of the independent contractor is the element of control that was absent in these cases, *id.* at 300; *Williams,* 669 F.2d at 679, and is lacking in the present case. The existence of an independent board of directors over which the County has no power of appointment or removal, *see Williams,* 669 F.2d at 679, also weakens Powell's position.

■ Powell's argument that substantial state regulation can change a private corporation into a state agency was expressly rejected by the Eleventh Circuit in *Williams.* The court stated that

we find it difficult to distinguish Eastside from a variety of private corporations and professional individuals that are subject to similar state control pursuant to licensing statutes. Such controls are normal means by which states effectuate public policies through the regulation of private entities. These licensing controls do not, however, somehow magically transform the fundamental nature

of the licensed entity into a public agency or official.

We find this reasoning persuasive authority for rejecting Powell's argument that the regulations contained in the contract were sufficient to transform the Museum into a public agency.

■ Because the Museum is a private corporation which is an independent contractor of Pima County, it is not an "activity of a public agency" under 29 U.S.C. § 203(s)(6) and thus is not subject to the requirements of the FLSA.[2] The judgment of the district court granting summary judgment in favor of the Museum is

AFFIRMED.

NELSON, Circuit Judge, dissenting:

I respectfully dissent. Neither the plain language of the statute nor the case law provides adequate support for the result reached by the majority. Construing the FLSA broadly in accordance with Supreme Court directives, I would hold that the FLSA applies to the Tucson Air Museum ("Museum") because it is an "enterprise" which "is an activity of a public agency" under 29 U.S.C. § 203(s)(6).

The FLSA is a remedial statute which protects employees engaged in interstate commerce by guaranteeing them such things as a fair minimum wage and overtime pay. *See* 29 U.S.C. § 206(a). This Circuit has accordingly given a liberal in-

---

**1.** Because we have found no cases interpreting this section of the Act, we rely upon several cases which have considered this issue in the context of private corporations trying to escape FLSA coverage by arguing that they were public agencies exempt from operation of the Act under *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976) (overruled by *Garcia v. San Antonio Metropolitan Transit Authority,* ⎯ U.S. ⎯, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985)). Although these cases are obviously not controlling, they provide a useful analysis of the issue.

**2.** We disagree with the dissent's assertion that the Museum is an "'enterprise' which 'is an activity of a public agency' under 29 U.S.C. § 203(s)(6)." Dissenting opin. at 1312. The dissent argues that this court should reach for a "liberal" or "expansive" interpretation of the

statute and would rewrite the statute to respond to an imagined evil: that public agencies which are now subject to the FLSA under *Garcia* will seek to avoid its requirements by contracting with private parties not subject to the Act to perform their duties. That is not what occurred here, because the public agencies were exempt from the FLSA under *National League of Cities* when this contract was entered into. Moreover, the Museum conceded at argument that it will be required to comply with the Act in the near future because its gross sales will exceed the minimum set forth in 29 U.S.C. § 203(s)(1). More importantly, it is improvident to distort the plain language of a statute to cover a contingency that has not yet occurred. If the problem the dissent foresees comes to pass, Congress can always amend the Act to prevent public agencies from avoiding its coverage in this manner.

terpretation to FLSA sections. *See, e.g., Bonnette v. California Health & Welfare Agency,* 704 F.2d 1465, 1469 (9th Cir.1983) (adopting "expansive interpretation" of term "employer" in order to effectuate FLSA's broad remedial purposes) (citing *Real v. Driscoll Strawberry Associates, Inc.,* 603 F.2d 748, 754 (9th Cir.1979)). As the Supreme Court recently stated, "[t]he Court has consistently construed the [FLSA] 'liberally to apply to the furthest reaches consistent with congressional direction' ... recognizing that broad coverage is essential" to accomplish the FLSA's purposes. *Tony and Susan Alamo Foundation v. Secretary of Labor,* — U.S. —, 105 S.Ct. 1953, 1959, 85 L.Ed.2d 278 (1985) (quoting *Mitchell v. Lublin, McGaughy & Assoc.,* 358 U.S. 207, 211, 79 S.Ct. 260, 264, 3 L.Ed.2d 243 (1959)). The majority's analysis not only ignores this fundamental canon of FLSA interpretation, it runs counter to it.

This is evidenced by the majority's overly restrictive interpretation of section 3 of the FLSA, 29 U.S.C. § 203. Section 203(s) defines "enterprise engaged in commerce" as one which is involved in interstate commerce and which satisfies one of six other criteria. The sixth of these is that the enterprise "is an activity of a public agency." The preceding three grounds for coverage are that the enterprise "is engaged in" the clothing business, "is engaged in" construction, or "is engaged in" the operation of a hospital or school. 29 U.S.C. §§ 203(s)(3), (4), (5). In section 203(x), "public agency" is defined, but "activity of a public agency" is not.

The plain language of the statute convinces me that one need not actually *be* a "public agency" as defined in section 203(x) in order to be an "enterprise" which "is an activity of a public agency" under section 203(s)(6). If Congress had wished to limit this section's coverage to public agencies, it could have easily made clear its intention to do so. It could have continued the "is engaged in" form, used in the three preceding paragraphs, by writing paragraph (6) to say "is engaged in by a public agency." Alternatively, the section could have said

"is a public agency." A third simple option would have been for Congress to define "activity of a public agency" as "those activities performed by" the governmental units defined as "public agencies." Instead, Congress chose to say "is an activity of a public agency." Because I believe the word "activity" must be given some meaning, I must conclude that Congress meant to extend the coverage of section 203(s)(6) beyond those entities falling into the narrow statutory definition of "public agency."

Logically, then, our main analytical focus must be on the nature of the *activity* rather than the nature of the *entity.* The majority's reliance on the guidelines articulated in *Williams v. Eastside Mental Health Center,* 669 F.2d 671 (11th Cir.), *cert. denied,* 459 U.S. 976, 103 S.Ct. 318, 74 L.Ed.2d 294 (1982), and *Skills Development Services, Inc. v. Donovan,* 728 F.2d 294 (6th Cir.1984), is misplaced for that reason. Those cases analyzed whether the tenth amendment barred application of the FLSA to private entities claiming to be "state agencies;" thus, the primary focus in those cases was properly on the nature of the entities themselves.

The unique historical context of these cases cautions strongly against relying on them here. In 1974, Congress expanded the FLSA's definition of "employer" to include "a public agency" and expanded the definition of "enterprise" to include "an activity of a public agency." *National League of Cities v. Usery,* 426 U.S. 833, 838, 96 S.Ct. 2465, 2468, 49 L.Ed.2d 245 (1975). Very soon thereafter, the constitutionality of these amendments was challenged as applied to the "traditional functions" of state government. *Id.* at 838–39, 96 S.Ct. at 2468. The Court held that this extension of the FLSA was indeed unconstitutional as applied to the states' "integral operations in areas of traditional government functions." *Id.* at 852, 96 S.Ct. at 2474.

Armed with the *National League of Cities* holding, the private entities in both

*Williams* and *Skills Development* argued, unsuccessfully, that they were exempt from FLSA coverage on tenth amendment grounds. In *Williams*, the court said that

> [t]he defendant-appellee Eastside Mental Health Center claims exemption ... under the principles set out in [*National League of Cities* ]. Appellee asserts that [*National League* ] requires FLSA exemption for all *state or public agencies* performing traditional public functions. The appellee argues that because Eastside is so thoroughly allied with the State of Alabama, and furthermore because it is engaged in an ordinarily public function, ... the [*National League* ] test has been satisfied and exemption is appropriate. We disagree....

669 F.2d at 675 (emphasis added). Construing this constitutional exemption narrowly, the *Williams* court adopted the test used by the NLRB in "cases involving the issue of *whether a particular entity is a political subdivision* and is therefore exempt from provisions of the National Labor Relations Act.." *Id.* at 677 (emphasis added). The court applied this "political subdivision" test, which emphasizes the power of public officials, or the public generally, to remove the entity's administrators, in order to analyze the question whether the mental health center was "an arm of the state." *Id.* at 679. Because public officials lacked that power, the court concluded that the center "is not a state agency or a political subdivision of a state," and was therefore not exempt, on tenth amendment grounds, from the FLSA. *Id.* The court emphasized that "[t]he determinative fact in this case is simply that the entity with which we are dealing is not *a state or a political subdivision* as defined by the Court in [*National League of Cities* ] and other cases involving similar issues." *Id.* at 678 (emphasis added).

In *Skills Development*, the Sixth Circuit faced a virtually identical question: whether "private corporations providing services to the mentally retarded under contracts with the State of Tennessee" were exempt from FLSA regulation under *National League of Cities.* 728 F.2d at 296. Citing *Williams*, the court concluded that

> regulating the Contractors would not regulate a state, state agency, or political subdivision of a state. The Contractors are clearly not states, and the contracts that create their relationship with the state show that the parties did not intend that the Contractors be considered state agencies.

*Id.* at 299. The court applied the NLRB's "political subdivision" test, following *Williams*, explaining that " 'the rationale for the 'political subdivision' test has its ultimate basis in Tenth Amendment consideration of state sovereignty and the Eleventh Amendment grant of judicial immunity to the states.' " *Id.* at 299 n. 5 (quoting *Crestline Memorial Hospital Association v. NLRB*, 668 F.2d 243, 245 n. 1 (6th Cir. 1982)). The court concluded that "*[t]hese tenth amendment considerations* make the NLRB test relevant here." 728 F.2d at 299 n. 5 (emphasis added).

By utilizing the test from *Williams* and *Skills Development*, the majority thus applies a tenth amendment-based set of considerations to a case that has nothing to do with the tenth amendment. After *Garcia v. San Antonio Metropolitan Transit Authority*, — U.S. —, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985) (overruling *National League of Cities* ), I simply fail to grasp the relevance for our purposes of the "political subdivision" test. Because I believe that an entity need not *be* a "state, state agency or political subdivision of a state" in order to be considered an "enterprise" which "is an activity of a public agency," I also believe that the use of this tenth-amendment based test leads to a far too restrictive application of the statute.

In this case, I conclude that the Museum is indeed an "activity of a public agency" whose employees should receive the benefits of FLSA coverage on that basis. The Museum's day-to-day activity and very existence is determined in whole or part by Pima County. This is clear from a detailed look at the contract between the Museum and the County. Because the majority

opinion summarizes this relationship only briefly, and because it is so crucial to my conclusion, I recite its key features in more detail.

As consideration for the County's grant of the "exclusive right and duty to operate the public park," the Museum promises to maintain and operate the facility "at its own expense." But the County reserves the right to terminate the agreement at the end of its term, and at that time "all exhibits shall be surrendered to the County." The County sets admission fees and approves all concessionaires, and may withhold approval for any reason of any "lease of concessions." The County sets the general fee schedule and must approve hours of operation. The Museum must open its premises to County inspectors "at all reasonable times." The County is empowered to terminate the agreement upon written notice if any of a number of stated conditions occur.

The County maintains similar control over improvements to the Museum. No improvements may be made without written approval by the County, which "may withhold approval for any reason whatsoever." Permanent improvements are County property. The Museum is prohibited from taking actions which adversely affect the environment. It cannot, without County approval, erect advertising signs. The County is given the "right to construct and maintain upon the premises facilities for the public use."

The County also maintains close control over the Museum's finances. The agreement states that "[a]ll revenues whatsoever ... shall be used solely for the operation, maintenance, development and improvement of the museum" and that all expenditures and salaries must be such that "encourage the growth of a museum" rather than deplete its resources. Similarly, all profits must be used solely for the "operation, maintenance, improvement and development" of the Museum. The Museum is instructed to use only County-approved accounting methods, must submit annual financial statements to the County,

and must open its books for inspection and audit by the County "at all reasonable times." The Museum must submit annual budgets to the County, which "has the right to direct changes in said budget." Accounting records must be "adequate to enable [the] County to determine the level of County financial support necessary to the operation and development of the Air Museum."

As to hiring, the County agrees to provide the Museum with "two full-time County employees" for two years from the date of the agreement, after which time the "County may, in its discretion, extend the employment of the two employees at the Museum for a period which the County deems necessary and proper under the circumstances." The Museum further agrees to follow non-discriminatory hiring practices. Control over the work force is otherwise left to the Museum in its purported capacity as an "independent contractor:" the Museum shall "employ and direct such personnel as it requires."

Despite all these indicia of County control, the majority today adopts a rule which focuses on two factors: that the Museum's officials are not "directly responsible to public officials or to the general public," and that the Museum is labeled an "independent contractor." By so doing, the majority authorizes governmental entities which, after *Garcia*, — U.S. —, 105 S.Ct. 1005, 83 L.Ed.2d 1016, clearly would be subject to the FLSA were they to operate facilities *themselves*, to avoid paying minimum wage and overtime by engaging an "independent contractor" to operate the facilities. As long as the magic words "independent contractor" appear in the contract, and as long as public officials or the general public cannot remove the contractor's administrators, the governmental unit can exert as much control as it desires—including, as here, providing as much financial support as necessary for the contractor's continued operations and maintaining the unilateral power to revise the budget, to set fees and hours of operations, and to terminate the contract itself. Because I do

not believe that either Congress or the Supreme Court would approve of such a narrow interpretation of the FLSA, I must dissent.